# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PLATYPUS WEAR, INC., <br><br>                  Plaintiff, <br><br>   v. <br><br>BAD BOY EUROPE LTD, *et al.* <br><br>                 Defendants. | Case No. 16-cv-02751-BAS-MSB <br><br>**ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br>**[ECF No. 60]** |

     In 2016, Plaintiff Platypus Wear, Inc. filed suit against Defendants Bad Boy Europe LTD, Deep Blue Sports LTD, John Paul Gardner, and Deep Blue Sportswear LTD. ("Compl.," ECF No. 1.)[1] Plaintiff brings causes of action for declaratory relief, breach of contract, fraud and deceit, relief based on rescission, fraudulent transfer, unjust enrichment, and trademark infringement. After many years of litigation, this case has reached the summary judgment stage, and Plaintiff moves for partial summary judgment against Defendant Gardner. ("MSJ," ECF No. 60.) Plaintiff seeks a declaratory judgment that

---

[1] Defendant Deep Blue Sportswear LTD has been dismissed. (ECF No. 30.) Defendant Bad Boy Europe LTD is referred to herein as "Bad Boy" or "BBE" and Defendant Deep Blue Sports LTD is referred to herein as "Deep Blue."

1

Defendant Gardner is the alter ego of the two entity Defendants, summary judgment on its breach of contract claim, and rescission of an agreement based on Gardner's alleged fraud and deceit.[2]

Plaintiff noticed its MSJ for September 30, 2019, thus, Gardner's opposition was due on September 16, 2019. Instead, Gardner filed an opposition on September 24, 2019, ("Opp'n," ECF No. 69), after Plaintiff had filed its timely reply brief. The Court then permitted Plaintiff to file another reply brief that responded to Gardner's opposition. Plaintiff did so, ("Reply," ECF No. 70), and the Court therefore will not consider Plaintiff's first reply brief. The Court also denies Plaintiff's request that the Court grant its MSJ simply because Gardner's opposition was untimely. Plaintiff was not prejudiced by the untimeliness, and the Court prefers to adjudicate issues on the merits rather than on a procedural flaw. *See also Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1081–82 (9th Cir. 2000) ("[W]e have repeatedly held that a motion for summary judgment cannot be granted simply because the non-moving party violated a local rule.").

The Court finds this Motion suitable for determination on the papers and without oral argument. Civ. L. R. 7.1(d)(1). For the reasons stated below, this Court **GRANTS IN PART** Plaintiff's Motion.

## I. BACKGROUND[3]

Plaintiff is a company that licenses its intellectual property in connection with a variety of products and services. ("Offner Decl.," ECF No. 60-1, at ¶ 2.) The entity Defendants (Deep Blue and BBE) were Plaintiff's former licensees for two of Plaintiff's

---

[2] The MSJ is brought only against Defendant Gardner. Plaintiff previously moved for default judgment against Defendants BBE and Deep Blue. The Court denied the motion without prejudice, stating, "Plaintiff may refile its motion for default judgment against the entity Defendants once the claims against Gardner are resolved." (ECF No. 37, at 2.)

[3] The majority of the background section comes from Plaintiff's Motion and the declaration of Plaintiff's C.E.O. Robin Offner because Gardner's opposition does not provide any background facts. But the Court has included any disputed background information that it was able to gather from Gardner's opposition.

brands. (*Id.* ¶ 2.) At the time the parties entered into agreements, Defendant Gardner was the shareholder and managing director of Deep Blue and BBE. (*Id.*)

In 2010, the parties entered into a license agreement. (*Id.* ¶ 5.) In 2013, the parties entered into an addendum to that agreement. (*Id.*) The two agreements are collectively referred to herein as the "License Agreement."[4] When the License Agreement expired, Deep Blue and BBE "were in breach of the License Agreement, owing substantial unpaid royalties and marketing commitment shortfalls" to Plaintiff, and also had in their possession thousands of dollars of unsold inventory. (*Id.* ¶ 10.) The parties met and negotiated a Second Addendum. (*Id.* ¶ 12.) According to Offner, before the parties agreed to the Addendum, Gardner made some representations and promises. (*Id.* ¶ 13.) He represented that BBE "owned the substantial inventory of a licensed products and was fully capable of and intent on continuing its normal business operations." (*Id.*) He represented that he was about to sell Deep Blue. (*Id.*) He represented that he would continue to market the products as he had done in the past. (*Id.* ¶ 14.)

Gardner disputes that he made any promises when negotiating the Addendum. But, regardless of what the parties discussed off the record, the Second Addendum speaks for itself. The Addendum was executed in November 2015. (Exhibit C.) It provides, inter alia, that neither party shall owe money to the other and all parties waived financial claims against each other. (Exhibit C at C-2.) Deep Blue was released from its financial obligations and Plaintiff was released from financial obligation arising from the Bad Boy MMA, LLC Share Purchase Agreement. The Addendum listed certain agreements and promises made by Defendants. Specifically, Deep Blue confirmed that it had "transferred all of the stock of Licensed Product to BBE" and assigned the License Agreement in its entirety to BBE. (*Id.* at C-3.) BBE agreed to pay royalties on all sales under the License

---

[4] The parties entered into a Supplements License in September 2014, which pertained to supplements and was "completely separate" from the other agreements, with separate royalty and marketing requirements. (*Id.* ¶ 9.) There do not appear to be any issues that arose from the Supplements License.

Agreement. (*Id.* at C-4.) BBE agreed to "maintain its normal operations" and it committed to various marketing activities. (*Id.* at C-7.)

Offner claims Deep Blue/ BBE then sold licensed product but did not pay Plaintiff royalties. (Offner Decl. ¶ 18.) Deep Blue/BBE also allegedly stopped all marketing efforts (an assertion that Gardner disagrees with). (*Id.* ¶ 19.) Plaintiff issued a default notice in December 2015, and Gardner called Offner and asked him not to terminate the license and to allow sales to continue through the holiday season. (*Id.* ¶ 20.) At the time, Offner did not know that Gardner had formally resigned as director of BBE and he "had no official role" there. (*Id.*) Following Offner's discussion with Gardner, Offner decided not to terminate the license at that time. Plaintiff eventually terminated the License Agreement in January 2016. (Offner Decl. ¶ 21).

Offner alleges he later learned that before the parties had entered into the Second Addendum, Gardner met with a professional liquidation advisor in the United Kingdom, a company called Wilson Field. (*Id.*) Gardner does not contest that he "partook in a meeting with Wilson Fields [sic] around the date mentioned" but states the meeting was to ensure BBE was solvent and "able to maintain its normal operations." (Opp'n at 6.) Offner also learned that in August 2015, before the parties had entered into the Second Addendum, Gardner filed a Registration of a Charge, a form showing that Deep Blue had been given a lien on all of BBE's assets. (Exhibit E; Offner Decl. ¶¶ 21, 23.) Plaintiff filed this lawsuit in November 2016.

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

4

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

If the moving party fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970). If the moving party meets this initial burden, however, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Such admissions may be presented in testimony of a party's own witnesses through declarations. *See* Fed. R. Civ. Pro. 56(c)(4).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

///

## III. ANALYSIS

### A. <u>Procedural Issues</u>

#### 1. **Gardner's Documents and Plaintiff's Evidentiary Objections**

The Court begins by noting that Defendant Gardner is proceeding pro se and his opposition is unconventional and at times unclear. His opposition brief (with numerous pages of attached, unlabeled exhibits) is not submitted on lined or even numbered paper; accordingly, any page numbers of the opposition referenced herein refer to the pincite number at the top of the page. Gardner's brief begins with: "I declare under penalty of perjury under the laws of the state of California that the forgoing is true and correct as this declaration was executed on 13th September 2019 at Newcastle upon tyne, UK." (Opp'n at 2.) Because this declaration appears at the beginning of the document, there is no information "foregoing" (or listed before) the statement. The opposition concludes with: "Kind regards," signed by Mr. Gardner, and there is nothing at the end of the document that indicates the "foregoing" is declared under penalty of perjury. (*Id.* at 2, 13.)

Plaintiff refers to the document as an "executed version of [a] purported declaration" that it objects to because it was untimely, but Plaintiff does not appear to object to the format of the declaration/opposition. (*See* ECF No. 71-1.) Given Gardner's pro se status and using a liberal reading of 28 U.S.C. § 1746, the Court will consider the opposition to be a declaration signed under penalty of perjury. The Court will construe Gardner's opposition liberally and will do its best to decipher the arguments.[5]

---

[5] Plaintiff objects to various portions of Gardner's declaration for a variety of reasons. (ECF No. 71-1.) First, Plaintiff makes objections under the best evidence rule because Gardner attempts to discuss the contents of various contracts. (For example, objections 7, 8, and 25.) *See* Fed. R. Civ. P. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."). The Court sustains these objections; the documents speak for themselves.

Plaintiff further objects to Gardner's lack of personal knowledge. The Court will only consider the portions of the declaration where Gardner discusses information of which he has personal knowledge. His opinion on the thoughts, intentions, or actions of others of which he has no personal knowledge is inadmissible (for example, objections 13 and 18.) *See* Fed R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be

Gardner attached various documents to his declaration. Plaintiff objects to each one of Gardner's attached exhibits, listing a variety of objections for each exhibit. The Court focuses on the objection of authentication. "A trial court can only consider admissible evidence in ruling on a motion for summary judgment." *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). "Authentication is a 'condition precedent to admissibility' and this condition is satisfied by 'evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *Id.* (internal citations and footnote omitted). "[U]nauthenticated documents cannot be considered in a motion for summary judgment." *Id.* "[A] proper foundation need not be established through personal knowledge but can rest on any manner permitted" by Federal Rules of Evidence 901(b) or 902. *Id.*

Gardner does not attempt to authenticate any of the exhibits using the methods in Rule 901(b) and does not even identify some of the documents at all. Further, none of the documents appear to be self-authenticating. *See* Fed. R. Evid. 902. Gardner provides no information as to why the exhibits would be admissible at trial. Without any attempt at authentication by Gardner, the Court cannot consider these exhibits and sustains Plaintiff's objection to all exhibits.

### 2. Requests for Admission Deemed Admitted

Plaintiff attaches as an exhibit Requests for Admission that it sent to Gardner during discovery in this case. (*See* Exhibit Z.) Plaintiff refers to the Requests as Gardner's admitted facts pursuant to Federal Rule of Civil Procedure 36(a)(3).

Rule 36(a)(3) provides, in part, that "[a] matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter." Plaintiff's counsel attests that she served Requests for Admission on Gardner by mail and email on April 5, 2019. Gardner

---

admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). The objections related to these statements are sustained. The Court overrules as moot the remainder of the objections, as the Court did not consider the objected-to statements in analyzing Plaintiff's MSJ.

7

did not respond until May 17, 2019. ("King Decl.," ECF No. 60-3, ¶ 2.) Thus, Gardner did not timely respond. Failure to respond to requests for admission is deemed an automatic admission. *F.T.C. v. Medicor LLC*, 217 F. Supp. 2d 1048, 1053 (C.D. Cal. 2002) ("No motion to establish the admissions is needed because Federal Rule of Civil Procedure 36(a) is self executing.").

There is no evidence that Gardner sought relief from the admissions due to his untimely response. *See* Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended."). And although Gardner is pro se and may not know the rules of discovery, a pro se party must still abide by the Federal Rules of Civil Procedure. *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995). The Requests are deemed admitted. (*See* Exhibit Z); *Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007) (upholding denial of motion to withdraw unanswered admissions and grant of summary judgment based on admitted matters); *Cook v. Allstate Ins. Co.*, 337 F. Supp. 2d 1206, 1210 (C.D. Cal. 2004) (finding that plaintiffs failed to timely respond to requests for admission and granting summary judgment on basis of admitted matters).

### A.  **Eighth Claim for Relief: Rescission**

Plaintiff seeks summary judgment on its eighth claim for relief: rescission based on fraud and deceit. (MSJ at 10.) Plaintiff alleges Gardner failed to disclose certain facts and falsely represented others, and this caused Plaintiff to enter into the Second Addendum. (Compl. ¶¶ 113–15.) Plaintiff elected the remedy of rescission of the Second Addendum, rather than damages. (MSJ at 10 n.1.) [6]

---

[6] Under California Civil Code § 1691, the party seeking to rescind a contract must, among other things, provide prompt notice of rescission. *Bourbeau v. Cognitive Code Corp.*, 693 F. App'x 499, 501 (9th Cir. 2017). Plaintiff provides that it served "a notice of rescission of the Second Amendment in the form of the arbitration claim" it filed, and also contends that the Complaint is further notice of rescission. (Compl. ¶ 120); *see* Cal. Civil Code § 1691 ("When notice of rescission has not otherwise been given or an offer to restore the benefits received under the contract has not otherwise been made, the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer

8

16cv2751

A party to a contract may rescind the contract if the consent of the party rescinding "was given by mistake, or obtained through duress, menace, fraud, or undue influence." Cal. Civ. Code § 1689(a). Plaintiff seeks rescission based on fraudulent nondisclosure, therefore, it must show Gardner (1) failed to disclose a material fact which he knew or believed to be true; and (2) had a duty to disclose such fact. *San Diego Hospice v. County of San Diego*, 31 Cal. App. 4th 1048, 1055 (1995). "The duty to disclose arises when two elements are present: (1) the material fact is known to (or accessible only to) the defendant; and (2) the defendant knows the plaintiff is unaware of the fact and cannot reasonably discover the undisclosed fact." *Id.* (emphasis omitted).

Plaintiff alleges that Gardner concealed several facts regarding BBE's solvency and liquidation, including (1) the "sham 'Agreement for the Sale and Purchase of Certain Assets,'" (2) Gardner's meeting Wilson Field, (3) BBE's insolvency; and (4) BBE's pledge of its assets to Deep Blue. (MSJ at 11.)

Addressing these allegations in order, first, it is unclear why Plaintiff refers to the Agreement for the Sale and Purchase of Certain Assets (Exhibit F) as a "sham"—without further information, the Court cannot deem the Agreement a material fact that should have been disclosed.[7] Second, as to the meeting with Wilson Field, Gardner admits he met with someone at Wilson Field, but states he did so "to ensure that the debt introduced by the stock transfer didn't make the business insolvent and to ensure we all understood what the worst case could look like." (Opp'n at 6.) This is contradicted by Plaintiff's request for admission (which is deemed admitted) that requests Gardner admit that when he met with Wilson Field, he discussed putting BBE into liquidation. (Exhibit Z at Z-2.) Thus, while it is likely true that Gardner met with Wilson Field to discuss liquidation of BBE,[8] given

---

or both."). Gardner does not dispute this, and the Court finds that Gardner is on notice of Plaintiff's sought rescission.

[7] The Agreement states Deep Blue sold BBE "the stocks of the Bad Boy branded merchandise and the stocks of supplements and nutritional goods owned by" Deep Blue. (Exhibit F.)

[8] Gardner does not dispute that BBE was eventually liquidated. (*See* Opp'n at 7; Offner Decl. ¶ 21.)

9

the conflicting evidence, there is an issue of material fact as to why Gardner met with Wilson Field. This creates a genuine issue of material fact as to whether the meeting should have been disclosed to Plaintiff. Third, as to the allegation of BBE's insolvency, Plaintiff has presented no evidence that BBE was insolvent at the time the Second Addendum was negotiated; the only evidence is that Offner learned in January 2016 that BBE was insolvent. (*See* Offner Decl. ¶ 21.) The Court now focuses on the fourth allegation: the issue of the Registration of a Charge.

The English system recognize many security devices, one being charges. A charge is comparable to a Uniform Commercial Code security interest used in the American system. Lynn M. LoPucki et. al., *Optimizing English and American Security Interests*, 88 Notre Dame L. Rev. 1785, 1792 (2013). A charge means an interest which a lender obtains in a company's property. Registration of a charge acts as notice that the charge holder has an interest in the charged property. *Id.*

As noted above, a charge was registered in August 2015, providing that all of BBE's current and future "estates and interests in any freehold and leasehold property" and all current and future intellectual property is charged. (Exhibit E.) Deep Blue is listed as the persons entitled. (*Id.*)

Gardner does not dispute that the charge was registered, instead, he states that Deep Blue "owned the stock and we did a process to transfer the stock to BBE." However, "as part of this we needed to affix a value and ensure things where done correctly under UK law. As the stock could not be paid for in full then both BBE and Deep Blue Sports Limited sought legal advice on how this could be structured" and then followed that legal advice. (Opp'n at 6.) He argues that he had to transfer the stock to Deep Blue, or "the liquidator would have taken the stock and would have sold to recover debts." (*Id.* at 7.) It appears that Gardner is contesting the reason why the charge was registered, but there is no dispute that it was registered and all of BBE's property was pledged to Deep Blue.

Soon after Gardner registered the charge, the parties entered into the Second Addendum, which released Deep Blue from its financial obligations. (Exhibit C.) In the

10

Addendum, Deep Blue confirms that it "transferred all of the stock of Licensed Product to BBE" and assigned the entire License Agreement to BBE. (*Id.* at C-3.) The Addendum provides that BBE agrees to "maintain its normal operations." (*Id.* at C-7.)

The Court finds that the registration of the charge is a material fact that Gardner should have disclosed prior to entering into the Second Addendum. Logically, when parties enter into a contract, they want to know if the other party has a lien on all of its property. Plaintiff entered into the Addendum and agreed to release Deep Blue from its financial obligations and continue the contractual relationship with BBE. The fact that Deep Blue had a lien on all of BBE's assets is a material fact. There is no dispute that Gardner did not disclose this filing to Plaintiff.

Gardner does not believe that he needed to disclose the charge to Plaintiff, arguing that the "debenture was registered on public record so nothing was hidden." (Opp'n at 5.) Even if the filing of the public document eliminated Gardner's duty to inform Plaintiff of the charge, the Court finds that Gardner had a duty to disclose the charge due to his representations in the Second Addendum. "A duty to disclose may . . . arise in the so-called "half truth" context—that is, when a speaker makes a representation which, though not false, he knows will be misleading absent full disclosure of additional facts known to him which qualify the initial representation." *San Diego Hospice*, 31 Cal. App. 4th at 1055 n.4; *see also Cicone v. URS Corp.*, 183 Cal. App. 3d 194, 201 (1986) ("One who is asked for or volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.").

The Second Addendum provides that Deep Blue transferred to BBE the stock of all Plaintiff's Licensed Product and assigned to BBE the License Agreement. (Exhibit C at C-3.) This is deceiving because Gardner did not tell Plaintiff that Deep Blue had a lien on everything BBE owned. Deep Blue had been released from any obligations, and the fact that it now owed no duty to Plaintiff but had such power over BBE should have been disclosed.

11

By entering into and signing the Second Addendum, Gardner made misleading statements and concealed facts. Offner "would not have executed the Second Addendum" on behalf of Plaintiff had he known of the Charge. (Offner Decl. ¶ 6.) Therefore, Plaintiff has established that it is undisputed that its consent was obtained through fraud. Plaintiff is entitled to rescission. The Court **GRANTS** the Motion for Summary Judgment as to Plaintiff's Eighth Cause of Action.

### B.   Sixth Claim for Relief: Breach of Contract

Plaintiff moves for summary judgment on its breach of contract claim. The contract at issue is the License Agreement. Plaintiff claims that Deep Blue/BBE breached the License Agreement by failing to satisfy their royalty and marketing obligations. (Offner Decl. ¶ 25.) The elements of a breach of contract cause of action are: "(1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." *CDF Firefighters v. Maldonado,* 158 Cal. App. 4th 1226, 1239 (2008) (citation omitted).

This cause of action is brought only against Deep Blue and BBE, not Gardner. (*See* Compl. ¶¶ 95–101.) Typically, only a party to a contract can breach it, *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294, (2002) and usually, the members of a California limited liability company cannot be personally liable on a contract signed on behalf of the limited liability company. *See* Cal. Corp. Code § 17101(a). Members "are subject to liability under the same circumstances and to the same extent as corporate shareholders under common law principles governing alter ego liability and are personally liable under the same circumstances and extent as corporate shareholders." *People v. Pac. Landmark*, 129 Cal. App. 4th 1203, 1212 (Ct. App. 2005) (emphasis removed). Plaintiff moves for summary judgment on its breach of contract claim against Gardner under an alter ego theory.

#### 1.   Alter Ego

Federal courts "apply the law of the forum state in determining whether a corporation is an alter ego" of an individual. *Towe Antique Ford Found. v. IRS*, 999 F.2d 1387, 1391

(9th Cir. 1993). Under California law, "[t]here is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case." *Mesler v. Bragg Mgmt. Co.*, 39 Cal.2d 290, 300 (1985). "[T]he doctrine is essentially an equitable one and for that reason is particularly within the province of the trial court. Only general rules may be laid down for guidance." *Assoc. Vendors, Inc. v. Oakland Meat Co.*, 210 Cal. App. 2d 825, 837 (1962). The two general rules established by the California Supreme Court are: "(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow." *Mesler*, 39 Cal.2d. at 300.

When applying these rules, California courts have considered a variety of factors, including:

> commingling of assets; diversion of corporate assets to personal use; whether the individual defendants held themselves out as personally liable for the debts of the corporation; whether the individual defendants acted in bad faith; whether the individual defendants entered into contracts with the intent to avoid performance by using the corporate entity as a shield against personal liability; whether the individuals and corporation used the same office; whether they employed the same attorney; whether the individuals used the corporation to procure labor, services and merchandise for another person or entity; whether the individuals failed to adequately capitalize the corporation; and whether the individuals failed to maintain minutes or adequate corporate records.

*Clark v. Dana Woody & Assoc., Inc.*, No. 9-cv-2931-CAB (DHB), 2013 WL 544030, at *2 (S.D. Cal. Feb. 12, 2013) (citing *Assoc. Vendors*, 210 Cal. App. 2d at 838–840).

The Court begins by noting that Plaintiff is not requesting the Court find that the entities are alter egos of each other; the question is whether Gardner is the alter ego of the companies. (*See* MSJ at 14.) Despite this, Plaintiff spends much of its brief pointing to transactions amongst and similarities between the companies. Indeed, Deep Blue and BBE may share the same office, employees, and assets. (*See* Exhibits C, F, X, and Y.) Money and property may have been freely transferred between the two entities. (MSJ at 10;

Exhibits F and Y.) But the issue is not whether the entities were treated as one in the same, instead, it is whether there are facts showing that there is a "unity of interest and ownership that the separate personalities of the [entities] and [Gardner] no longer exist." *Mesler*, 39 Cal.2d. at 300; *see Neilson v. Union Bank of Cal. N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003) (holding "a plaintiff must allege specifically both of the elements of alter ego liability, as well as facts supporting each."). The Court therefore focuses on any unity between Gardner and Deep Blue and between Gardner and BBE.

On various agreements and documents, Gardner is listed as the shareholder, managing director, and/or C.E.O of both BBE and Deep Blue. (Exhibits A, B, C, F, G, V; *see also* Offner Decl. ¶ 40.)[9] As to further facts regarding Deep Blue specifically, Plaintiff only presents that Gardner and Deep Blue are represented by the same attorney. (Exhibit DD.) Further, Gardner admits that Deep Blue was a "dormant company" (Opp'n at 8), but it is unclear what this means, and Plaintiff does not discuss this admission. As to BBE, Gardner registered BBE's domain name. (Exhibit CC.) Gardner also admits that at the time the Second Addendum was signed, BBE was undercapitalized. (Exhibit Z at Z-3) Further, Offner declares that Gardner told him he currently has a lien on BBE's assets. (Offner Decl. ¶ 21.)

While some of these facts weigh in favor of finding alter ego liability, there is simply not enough evidence. First, the fact that Gardner is solely in charge of the entities does not show that he is the alter ego of them; many companies are owned by just one person. Gardner formed the businesses and performed tasks that an owner typically performs, such as registering domain names and hiring employees. But Plaintiff has submitted no evidence that Gardner disregarded the corporate form of the businesses. There is no evidence that Gardner used entity funds to perform personal tasks, comingled his assets

---

[9] BBE and Deep Blue are limited liability companies, which are entities that normally would not be said to have shares or shareholders. The Wilson Field Liquidator's Report lists Gardner as the sole shareholder of BBE. (Exhibit G.) Regardless of the official designation of the entities (i.e. LLC or corporation), it is clear that Gardner is the sole owner of both entities.

14

with those of the entities, or purposefully undercapitalized either entity.[10] Plaintiff contends that Gardner "used BBE as a mere sham . . . so that he could freely transfer assets around at his whim." (Reply at 9.) But what is missing is <u>any</u> evidence that Gardner transferred assets between his personal accounts and the entities' accounts, or that he blurred the line between himself and the entities. *See TFH Props, LLC v. MCM Dev., LLC*, No. CV-09-8050-PCT-FJM, 2010 WL 2720843, at *7 (D. Ariz. July 9, 2010) (finding a unity of interest based on factors such as: the individual paid the entity's bills from his personal funds, wrote checks from the entity's bank account to himself, and included the entity's income on his tax return). On the contrary, there is at least some evidence that Gardner respected the boundary between his funds and the entities' funds. Offner declares that Gardner stated, "the entities owed him for past monies that he had invested." (Offner Decl. ¶ 21.) If Gardner was treating the entities' money as his own, it is more plausible that he would have simply taken money from them, rather than acknowledge that the entities owed him money. This is evidence that Gardner respected the corporate form. And there are no facts that Gardner treated the entities as extensions of himself.

Although Plaintiff points to a few facts which support its alter ego claim, given the totality of the circumstances, the Court finds Plaintiff has not met its initial burden of demonstrating there is no genuine issue of material fact as to the issue of unity of interest under the alter ego test. *See Century Sur. Co. v. Belmont Seattle, LLC*, 543 F. App'x 737, 738 (9th Cir. 2013) ("Summary judgment based on disregard of the corporate form is typically not appropriate, because '[w]hether a party is liable under an alter-ego theory is normally a question of fact.'" (quoting *Zoran Corp. v. Chen,* 185 Cal. App. 4th 799 (2010)). Thus, the Court need not proceed to the second prong of the alter ego test. Summary judgment on Plaintiff's alter ego claim is not appropriate.

---

[10] Although Gardner admitted that BBE was undercapitalized at one point in time, (ECF No. Z at Z-3), there is no further detail as to why or for how long it was undercapitalized. Further, there is no evidence that Deep Blue is or ever was undercapitalized.

15

### 2. Conclusion on Breach of Contract

Because Plaintiff has not met its burden in establishing that Gardner is the alter ego of the entities, Plaintiff cannot move for breach of contract against Gardner. The Court **DENIES** Plaintiff's motion for summary judgment as to the breach of contract claim.

### C. Damages

Although Plaintiff does not clearly make the point, it appears that Plaintiff is arguing that although the Second Addendum released the obligations of License Agreement, the Second Addendum should be rescinded and therefore the License Agreement reinstated. The Court grants Plaintiff summary judgment on the rescission, which does not result in damages. Because Plaintiff cannot proceed on its breach of contract claim against Gardner individually, the Court does not evaluate Plaintiff's sought damages.

## IV. CONCLUSION

The Court **GRANTS IN PART** Plaintiff's Motion for Summary Judgment, finding Plaintiff is entitled to summary judgment on its claim for rescission of the Second Addendum. Within fourteen days of this Order, the parties are to jointly contact the chambers of Magistrate Judge Berg to schedule a case management conference.

**IT IS SO ORDERED.**

**DATED: January 23, 2020**

Hon. Cynthia Bashant
United States District Judge